IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

MELVIN H. GALE, INDIVIDUALLY
AND AS TRUSTEE OF THE
MELVIN H. GALE & LEONA GALE TRUST, and
STANLEY SPIELMAN, an individual

Plaintiffs,

CASE NO: 502007CA014725XXXXMB

vs.

DIVISION: AO

RFC SECURITIES, LLC, a Florida
limited liability company,
ROSS F. CHARNO, an individual,
MIRIAM CHARNO, an individual, and,
AMANDA CHARNO, an individual, and,
THE COURT-APPOINTED REPRESENTATIVE OF
THE ESTATE OF IRVING CHARNO, DECEASED.

Defendants.

______________________________________/

**AMENDED COMPLAINT**

Plaintiffs, Melvin H. Gale, individually and as Trustee of The Melvin H. Gale & Leona Gale Trust, and Stanley Spielman, individually, by and through their undersigned counsel, file this Amended Complaint against Defendants, RFC Securities, LLC, Ross F. Charno, Miriam Charno and Amanda Charno and the Court-Appointed Representative of the Estate of Irving Charno.

**Introduction**

1. This case is a result of the greed of a young man, Ross F. Charno, which compelled him to exploit the trusting and caring bonds his grandfather, Irving Charno, shared with his two dear and wealthy friends, the Plaintiffs in this case, Melvin H. Gale and Stanley Spielman.

2. One of Ross F. Charno's first steps in exploiting these relationships was his formation of RFC Investments, LLC. He appointed his grandfather to be his agent to fraudulently siphon money from of Plaintiffs and into RFC Securities so he could convert the

money to his own personal use. In furtherance of the scheme, Irving approached Melvin and Stanley on many separate occasions. He showed each of them a document purporting to represent the profitable success of RFC Securities. He explained to Melvin and Stanley that the entity through which RFC Securities sought to trade, Goldman Sachs, was requiring RFC Securities to deposit a significant amount of money to be held in an escrow account. According to Irving, once this escrow was established, RFC Securities would be able to trade through Goldman Sachs. Irving unambiguously represented to Melvin and Stanley that the money in the escrow would be secure, that it would not be traded or accessible for any purposes, that the money loaned would earn between 12% to 13% interest, and that the principal of each loan would be returnable to Stanley and Melvin upon demand with a thirty-day notice. It was abundantly clear at all times that the principal of each and every loan was <u>not to be traded</u> or used for any purpose other than satisfaction of the purported Goldman Sachs escrow requirement. Ross confirmed these representations orally, in subsequent letters of confirmation and in written personal guarantees.

3. Relying on these ongoing material representations, omissions of material fact and active concealment of material fact, between 2005 and early 2007, Stanley Spielman loaned RFC Securities approximately $7,405,130.00 and Melvin Gale loaned RFC Securities $1,500,000.00. Neither knew that the other had provided any money to Ross, Irving and RFC Securities because Irving and Ross conferred with them separately and secretly. Defendants never mentioned or discussed the transactions in the joint presence of Plaintiffs and Plaintiffs never discussed the transactions between themselves. It was not until Irving was on his death bed in April 2007 that Melvin and Stanley realized that they had each been part of the same unlawful scheme.

4. At that time Melvin and Irving asked Ross about the status of the principal and requested its return. Ross responded by simply stating: "**It's lost.**" Thereafter, neither Melvin nor Stanley received any interest payments and neither received the return of the substantial principal, despite several oral and written demands. Thus, not only did Melvin and Stanley lose their best friend, Irving, they also realized they had been scammed by his grandson for over $8,905,130.00 in principal alone. Ross has since refused to return the money of Melvin and Stanley, forcing them to file this action seeking damages and disgorgement of at least **$27,971,286.00.** This Amended Complaint raises claims under Florida's Civil Remedies for Criminal Practices Act, fraudulent inducement, conversion, civil theft, civil conspiracy, and alternative counts for breach of promissory note, breach of personal guarantees, breach of contract and accounting.

## GENERAL ALLEGATIONS

**Plaintiffs**

5. Plaintiff, Melvin H. Gale, ("Melvin Gale") is an individual with a residence in Boca Raton, Palm Beach County, Florida, and is the Trustee of the Melvin H. Gale & Leona Gale Trust (the "Trust"). Because he is the Trustee of the Trust, and because he was personally involved in the events described herein, Melvin Gale has standing to bring the claims set forth in this Complaint.

6. Melvin Gale is in his 70s and is considered "elderly" for purposes of Fla. Stat. § 772.11(5).

7. Plaintiff, Stanley Spielman, is an individual with a residence in Boca Raton, Palm Beach County, Florida.

8. Mr. Spielman is in his 80s and is considered "elderly" for purposes of Fla. Stat. § 772.11(5).

9. Both Melvin Gale and Stanley Spielman were very dear and close friends with Irving Charno. They all owned residences in Bocaire, an affluent neighborhood in Boca Raton.

**Defendants**

10. Defendant, RFC Securities, LLC, ("RFC Securities") is a Florida Limited Liability Company established by Ross F. Charno on or around October 20, 2005.

11. RFC Securities operates and conducts business from Broward County. RFC Securities solicited the loans at issue in this proceeding in Palm Beach County through its actual or apparent agent, Irving Charno, committed torts which accrued in Palm Beach County, committed criminal acts in Palm Beach County, breached contracts to make payments due in Palm Beach County, and has contractually agreed to venue in Palm Beach County.

12. RFC Securities is the alter ego of Defendant, Ross F. Charno. RFC Securities conspired with the other Defendants in furtherance of Ross F. Charno's unlawful scheme described below.

13. Defendant Ross F. Charno is an individual who resides in Broward County, Florida. Ross F. Charno was the sole Manager, Managing Partner and President of RFC Securities. Ross F. Charno was the grandson of Irving Charno and Miriam Charno and the husband of Amanda Charno. Ross F. Charno executed personal guarantees for RFC Securities' repayment of the money Plaintiffs loaned to RFC Securities at issue in this proceeding. Ross F. Charno solicited the loans at issue in this proceeding in Palm Beach County, committed torts which occurred in Palm Beach County, committed criminal acts in Palm Beach County, breached contracts to make payments due in Palm Beach County, and has contractually agreed to venue in Palm Beach County. Ross F. Charno conspired with the other Defendants in furtherance of Ross F. Charno's unlawful scheme described below.

14. Defendant, Irving Charno was a resident of Boca Raton, Palm Beach County, Florida. In late April of 2007, Irving Charno passed away after suffering from a brain tumor. Irving Charno was the grandfather of Ross F. Charno and the husband of Miriam Charno. Irving Charno was the actual or apparent agent of RFC Securities and of Ross F. Charno but also acted in an individual capacity. Irving Charno executed personal guarantees for RFC Securities' repayment of the monies loaned to RFC Securities and contractually agreed to venue in Palm Beach County. Irving Charno conspired with the other Defendants in furtherance of Ross F. Charno's unlawful scheme described below.

15. Defendant Miriam Charno is an individual who resides in Palm Beach County, Florida. Miriam Charno was the wife of Irving Charno and is the grandmother of Ross F. Charno. Miriam Charno executed personal guarantees for RFC Securities' repayment of the monies loaned to RFC Securities and contractually agreed to venue in Palm Beach County. Miriam Charno conspired with the other Defendants in furtherance of Ross F. Charno's unlawful scheme described below.

16. Defendant Amanda Charno is an individual who resides in Broward County, Florida. At all times material Amanda Charno was the wife of Ross F. Charno. Amanda Charno executed personal guarantees for RFC Securities' repayment of the monies loaned to RFC Securities and contractually agreed to venue in Palm Beach County. Amanda Charno conspired with the other Defendants in furtherance of Ross F. Charno's unlawful scheme described below.

**Ross F. Charno's Formation of RFC Securities and the Inception of his Unlawful Scheme**

17. Ross F. Charno filed the Articles of Organization for RFC Securities on or around October 20, 2005.

18. Ross F. Charno is the Registered Agent of RFC Securities and is its sole

manager and managing member.

19. Ross F. Charno holds himself out to the public as the President of RFC Securities.

20. Ross F. Charno formed and used RFC Securities for the fraudulent, improper, illicit and unlawful purpose of soliciting and obtaining money from individuals, including the Plaintiffs, under the false pretense that the money was being loaned to RFC Securities, under the false pretense that the money would be held in a reserve account at Goldman Sachs, under the false pretense that the money would not be traded, under the false pretense that the money would not be accessible by Goldman Sachs or anyone else, and under the false pretense that the money would be returned to Plaintiffs upon demand after a short notice period.

21. Ross F. Charno designated and used his grandfather, Irving Charno, as his agent and as an agent of RFC Securities to further the fraudulent, improper, illicit and unlawful purposes described above in Paragraph 20. In the alternative, based upon Ross F. Charno's

22. Ross F. Charno was aware that Irving Charno was very close friends with wealthy and elderly individuals, including Melvin Gale and Stanley Spielman.

23. Melvin Gale and Stanley Spielman considered Ross F. Charno as part of their extended families, though they were not related by blood or though marriage.

24. Ross F. Charno knew or had reason to know that Melvin Gale and Stanley Spielman were over the age of 65 and in fact knew that they were both over the age of 75.

25. Ross F. Charno devised and implemented an illicit plan to exploit the trusted and caring bonds Irving Charno shared with Melvin Gale and Stanley Spielman.

26. Ross F. Charno devised and implemented an illicit plan to exploit the age and the wealth of Melvin Gale and Stanley Spielman.

27. In or around August 2005, Ross F. Charno devised and implemented his illicit plan to fraudulently obtain money from Melvin Gale and Stanley Spielman under the false pretenses described above in Paragraph 20. Ross F. Charno's ultimate goal was to obtain money which he could secretly convert to his own use and for the use of the other Defendants. Defendants agreed to and in fact did actively participate in this plan and furthered and pursued the plan through oral and written representations, omission of material fact and concealment of material fact. (This conspiracy is hereinafter referred to as Ross F. Charno's unlawful scheme).

28. The first target of Ross F. Charno's unlawful scheme was Stanley Spielman.

**Ross F. Charno's Exploitation of Stanley Spielman**

29. In August 2005, in furtherance of Ross F. Charno's unlawful scheme, and under the direction and control of Ross F. Charno, Irving Charno initiated discussions with Stanley Spielman regarding RFC Securities.

30. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Stanley Spielman that RFC Securities was very profitably engaged in "day trading" through Goldman Sachs.

31. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Stanley Spielman that RFC Securities was capable of competently trading in the stock market amounts of up to thirty million dollars.

32. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno showed to Stanley Spielman a "diary" consisting of entries on a Bocaire calendar/journal. According to Irving Charno, the entries represented the daily profits and the success of RFC Securities. (Bocaire is the community in which Irving Charno, Melvin Gale and Stanley Spielman resided).

33. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Stanley Spielman that in order for RFC Securities to continue its allegedly

successful trading, Goldman Sachs was demanding that RFC Securities deposit money to be held in an escrow account.

34. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Stanley Spielman that he and Ross F. Charno were upset that Goldman Sachs was imposing the requirement for the escrow funds, but advised that Ross F. Charno wanted to trade through Goldman Sachs to continue to build the successful trading of RFC Securities.

35. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno asked that Stanley Spielman "loan" money to RFC Securities for the specific purpose of satisfying the purported demand of Goldman Sachs that RFC Securities place funds or additional funds in the escrow account.

36. In response to Irving Charno's plea for a loan, Stanley Spielman inquired if the money they were asking him to loan to RFC Securities was going to be traded in the market or used directly for market investments. If the answer to this question was a "yes," then Stanley Spielman would not have provided any money in response to the pleas.

37. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno affirmatively represented to Stanley Spielman that none of the money they were asking Stanley Spielman to loan to RFC Securities would be traded; the principal of the loan would remain *untouched* in the Goldman Sachs escrow account. RFC Securities agreed it would pay Stanley Spielman 12% interest on the principal amount.

38. At all times, Irving Charno represented to Stanley Spielman that RFC Securities would be using its own funds or the funds of the other Defendants for trading purposes and would never use the principal which Stanley Spielman was being asked to loan for purposes other than satisfying the purported escrow requirement.

39. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno

represented to Stanley Spielman that RFC Securities needed the money only as a "short term" loan for the sole purpose of complying with the escrow demands of Goldman Sachs.

40. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Stanley Spielman that RFC Securities would return any money Stanley Spielman loaned to RFC Securities upon demand, so long as Stanley Spielman provided a short term notice, initially represented to be ninety (90) days. (This notice period was later shortened when Stanley Spielman made additional loans; the funds were then represented to be returnable to Stanley Spielman upon demand with a thirty day notice.)

41. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Stanley Spielman that RFC Securities would keep the money in an escrow account and that the money could not be accessed by Goldman Sachs or any other third party, even if RFC Securities had problems or issues related to RFC Securities' trading operations.

42. Stanley Spielman deemed each of the above-referenced representations by Irving Charno to be material to his decision to loan money to RFC Securities.

43. Stanley Spielman had no reason to believe that his dear friend Irving Charno would not be telling him the truth and was not aware of Ross F. Charno's unlawful scheme.

44. Regardless of Stanley Spielman's trust of Irving Charno, his decision to loan RFC Securities the requested money was first and foremost based upon Irving Charno's material representations set forth above.

45. Each above referenced statement made by Irving Charno was affirmatively confirmed by Ross F. Charno in subsequent conversations with Stanley Spielman and in written statements by RFC Securities and Ross F. Charno to Stanley Spielman.

46. Ross F. Charno's affirmative representations were intended to induce Stanley Spielman to loan a significant amount of money to RFC Securities and were all in furtherance of

Ross F. Charno's unlawful scheme.

47. On or around August 16, 2005, in reasonable reliance on Irving Charno's and Ross F. Charno's (sometimes collectively referred to herein as the "Charno's") material representations, Stanley Spielman transferred to RFC Securities $400,000.00 as a loan.

48. Ross F. Charno sent a letter dated August 16, 2005, on RFC Securities letterhead confirming Stanley Spielman's $400,000.00 loan.

49. Despite the appearance on the August 16, 2005, letter that RFC Securities was a legitimate Florida limited liability company, State corporate filing records show that RFC Securities was not formed until approximately two months later, on October 20, 2005.

50. In his August 16, 2005 letter, Ross F. Charno wrote:

> As per our conversation yesterday, [which was the day before the $400,000.00 loan] this is to confirm that you are able to receive $50,000.00 per month should you need to do so. In addition, we agree that you must give 3 months notice for the entire amount to be paid. As of now, I agree to pay you the monthly interest on your investment of $400,000.00 which amounts to $4,000.00. This is based on 12%. I am so thankful for your help. It is nearly impossible to find a man with your character in this day and time.

The August 16, 2005 letter is attached hereto as **Exhibit "A."**

51. After making this $400,000.00 loan, Irving Charno and Ross F. Charno again approached Stanley Spielman, made the same material representations set forth above, and induced Stanley Spielman to make another loan, on December 8, 2005, for $100,000.00. The Charnos did not advise Stanley Spielman that any portion of the first loan, the $400,000.00 loan, had been removed, transferred, converted or depleted from the escrow account or used or any purpose other than satisfaction of the purported Goldman Sachs escrow requirement.

52. Again, Ross F. Charno provided written confirmation of this loan through an RFC Securities letter dated December 13, 2005. The December 13, 2005 Letter is attached hereto as **Exhibit "B."**

53. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno and Ross

F. Charno continued to make request after request to Stanley Spielman for additional loans. With each request the Charnos made the same material representations and actively omitted and concealed material facts, to induce Stanley Spielman to give RFC Securities additional money. The Charno's explained with each additional request that Goldman Sachs was requiring RFC Securities to deposit additional money in the escrow account than originally anticipated.

54. Between August 2005 and February 2007, Stanley Spielman continued to rely on the Charnos' repeated oral and written statements, omission of material fact and concealment of material fact regarding the true status of the money he had loaned and was continuing to loan to RFC Securities.

55. The Charnos representations of material fact, omission of material fact and concealment of material fact were intended to perpetuate the fraud and conceal what Ross F. Charno was in fact doing with Stanley Spielman's money and were intended to induce Stanley Spielman to "loan" more and more money to the alleged escrow and to not exercise his right to a return of the money he had already loaned.

56. Between August 2005 and February 2007, the Charnos actively concealed the fact that Stanley Spielman's money was being converted, improperly and unlawfully used and, ultimately, depleted or diverted by Ross F. Charno, rather than being safely held in the Goldman Sachs escrow account.

57. In reasonable reliance on Irving Charno's and Ross F. Charno's representations of material fact, omission of material fact and concealment of material fact, Stanley Spielman made each loan to RFC Securities on or around the dates shown on the spreadsheet entitled "Spielman Loan to RFC Securities LLC, 2006-2007" attached hereto as **Exhibit "C."**

58. Ross F. Charno sent the above-referenced spreadsheet to Stanley Spielman on

or around May 21, 2007 and presumably drafted the spreadsheet, or had an agent or representative draft the spreadsheet.

59. In reasonable reliance upon Ross F. Charno's and Irving Charno's representations of material fact, omission of material fact and concealment of material fact, Stanley Spielman loaned RFC Securities a total amount in excess of **$7,405,130.00**, as of February 16, 2007.

60. In furtherance of Ross F. Charno's unlawful scheme and within days of each loan Stanley Spielman made to RFC Securities, Ross F. Charno sent a letter to Stanley Spielman confirming the loan amounts. Each letter contained continuing misrepresentations of material fact, omissions of material fact and concealment of material fact pertaining to the status and use of the money Stanley Spielman had loaned to RFC Securities, all as part of the ongoing fraud being perpetrated on Stanley Spielman. These letters dating from December 13, 2005 to March 15, 2007, hereinafter referred to as "Spielman Loan Confirmations," are attached hereto as **Composite Exhibit "D."**

61. In the Spielman Loan Confirmations, Ross F. Charno represented "I am planning on reducing your principal balance substantially each month." **See Composite Exhibit "D."**

62. Unbeknownst to Stanley Spielman, at the time Ross F. Charno made this representation and the other representations in the Spielman Loan Confirmations, Ross F. Charno had already or was in the process of wrongfully converting, unlawfully using and depleting or diverting the funds of Stanley Spielman. Upon information and belief obtained after the fact, Ross F. Charno was all along using the principal of each loan made by Stanley Spielman for the forbidden purpose of day-trading or other direct investment activities or his own personal use.

63. In the Spielman Loan Confirmations, Ross F. Charno's representations

continued: "All payout agreements remain the same." **See Composite Exhibit "D."**

64. In the Spielman Loan Confirmations, Ross F. Charno continued to represent that the ever-increasing principal was based upon "loans" from Stanley Spielman. For example, on February 15, 2007, he wrote "Your total loan amount to RFC Securities LLC is now $7,255,130.00." **See Composite Exhibit "D."**

65. In the Spielman Loan Confirmations, Ross F. Charno also made comments to appeal to Stanley Spielman's emotions and sense of family, again capitalizing on his close friendship with Irving Charno. He wrote comments such as "U really saved my life-Thank you so much;" "On a separate note, I would like to wish you a Happy Father's Day. You have always been a family to me, but <u>this year you have been like a Father</u>;" "I love you and I thank you for your unbelievable support. I could not have succeeded without your help." **See Composite Exhibit "D."** (emphasis added).

66. In a hand-written document faxed to Stanley Spielman on or around November 1, 2006, incidentally containing instructions informing Stanley Spielman how to wire yet additional money to the JP Morgan Chase account of RFC Securities, Ross F. Charno wrote: "Stanley, Thank you <u>for adopting me as yet another grandson</u>...here are the wiring instructions...." **See Composite Exhibit "D."** (emphasis added).

67. In the closing of the September 13, 2006 Spielman Loan Confirmation, Ross F. Charno had his grandparents, Irving Charno and Miriam Charno, add their signatures, again in an effort to exploit Stanley Spielman's friendship with Irving Charno. **See Composite Exhibit "D."**

68. Ross F. Charno made the statements described in Paragraphs 65, 66 and 67, above, for the sole purpose of exploiting Stanley Spielman's feelings of extended family and the appearance of a quasi-father-son relationship between Stanley Spielman and Ross F. Charno in

order to garner additional trust by Stanley Spielman. These statements were also made to facilitate Ross F. Charno's undue influence and overreaching in obtaining Stanley Spielman's money in furtherance of Ross F. Charno's unlawful scheme. Irving and Miriam Charno also signed the September 13, 2006 Spielman Loan Confirmation for the same purposes.

69. Because of the relationship and the statements and actions of Ross F. Charno, a fiduciary relationship existed between Stanley Spielman and Ross F. Charno which eased the ability of Ross F. Charno to exploit Stanley Spielman and further his illicit scheme. Because of Ross F. Charno's and Irving Charno's statements and actions, Stanley Spielman thought he was in a trusting and reliable relationship with the Charnos.

70. As confirmed by the Spielman Loan Confirmations, each loan of Stanley Spielman to RFC Securities was a separate contract or transaction. Ross F. Charno treated each loan as a separate contract or transaction for interest calculation purposes in the letters dated September 12, 2006, October 15, 2006, November 15, 2006, January 15, 2007 and March 15, 2007. **See Composite Exhibit "D."**

71. On May 11, 2006, Ross F. Charno, Irving Charno and Miriam Charno each executed a personal guarantee and RFC Securities executed a corporate guarantee for the loans Stanley Spielman made to RFC Securities. Under the terms of the guarantee, the notice period whereby the Defendants were required to return the full principal was shortened from ninety days to thirty days. The May 11, 2006 Personal Guarantee is attached hereto as **Exhibit "E."**

72. The May 11, 2006 guarantee letter was part of the ongoing fraud being perpetrated against Stanley Spielman and was part of Ross F. Charno's unlawful scheme.

73. As set forth in the final Spielman Loan Confirmation, dated March 15, 2007, the "total loan amount to RFC Securities LLC" from Stanley Spielman was $7,399,131.00. The March 15, 2007 Letter is attached hereto as **Exhibit "F."**

74. Stanley Spielman would not have loaned any of his money to RFC Securities if any Defendant revealed to him that Ross F. Charno or any other Defendant intended to or was in fact using the money for direct trading activities, or that the money was being otherwise unlawfully used, converted, depleted or used for any use other than remaining in the Goldman Sachs escrow account.

75. At no time before April 2007 did Ross F. Charno or Irving Charno advise, suggest, inform or even hint to Stanley Spielman that the money he had loaned to RFC Securities was being used, had been used, was planned to be used, or was even available for any use other than remaining in the Goldman Sachs escrow account.

76. Before April 2007, Stanley Spielman never received any indication that the money he loaned to RFC Securities was being used for trading purposes or for any purpose other than remaining in the Goldman Sachs escrow account. He has never received any investment or accounting statements related to trading activities from any Defendant, other than the Bocaire notebook shown to him before he made the first loan.

77. Had Stanley Spielman been advised that any of the money he loaned to RFC Securities was being used for trading purposes or for any purpose other than remaining in the Goldman Sachs escrow account, he would have objected, demanded an immediate return of his money and made no further loans.

78. Under no set of circumstances was the money Stanley Spielman loaned to RFC Securities to be used for trading purposes.

79. At no time before April 2007 did Ross F. Charno or Irving Charno advise, suggest, inform or even hint to Stanley Spielman that they had asked any other individuals, including one of his best friends, Melvin Gale, to loan, contribute or provide any money to the escrow account Goldman Sachs had allegedly required RFC Securities to maintain. Defendants

acted as if, and treated, their communications and transactions with Stanley Spielman as confidential.

Ross F. Charno's Exploitation of Melvin Gale

80. Ross F. Charno exploited Melvin Gale in the same manner and with the same oral and written material representations, omissions of material fact and active concealment of material fact as he did with Stanley Spielman, as thoroughly alleged above in Paragraphs 30 through 39. For example, Irving Charno and Ross F. Charno made the material representations to Melvin Gale as described below.

81. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Melvin Gale that Goldman Sachs was requiring RFC Securities to deposit and maintain $30 million in an account which he referred to as a "reserve" and "escrow" account.

82. Irving Charno and Ross F. Charno made it clear to Melvin Gale that any money Melvin Gale loaned to RFC Securities would be safe, untouchable and maintained in a separate account which would not be traded.

83. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Melvin Gale that he had an account with Bernard L. Madoff Investments which he was transferring to Goldman Sachs. He explained that Goldman Sachs prefers to do business with very large institutional customers, and in order for RFC Securities to trade through Goldman Sachs, RFC Securities had to make a substantial deposit of escrow funds for a reserve account.

84. In furtherance of Ross F. Charno's unlawful scheme, Irving Charno represented to Melvin Gale that if he loaned RFC Securities money to satisfy Goldman Sach's demands for reserve/escrow account, RFC Securities would pay Melvin Gale interest by using the funds of Defendants. Without the escrow, however, Irving Charno represented that RFC

Securities could not conduct any trading through Goldman Sachs.

85. Again, Irving Charno and Ross F. Charno made it clear to Melvin Gale that any and all interest payments would be made from the funds of Defendants and not through trading or investments of the funds Melvin Gale had provided and was providing through the loans.

86. In reasonable reliance upon Ross F. Charno's and Irving Charno's material and continuing representations of fact, omission of material fact and active concealment of material fact, Melvin Gale agreed to loan RFC Securities money as described in the following paragraphs.

87. On or around December 14, 2005, Melvin Gale made a loan to RFC Securities for $200,000.00.

88. On or around March 27, 2006, Melvin Gale made a loan to RFC Securities for $500,000.00.

89. On or around November 1, 2006, Melvin Gale made a loan to RFC Securities for $150,000.00.

90. In 2006, Melvin Gale made a loan to RFC Securities for $350,000.00.

91. On or around January 4, 2007, Melvin Gale made a loan to RFC Securities for $300,000.00.

92. In total, Melvin Gale made the six separate loans to RFC Securities totaling $1,500,000.00.

93. Each loan Melvin Gale made to RFC Securities was made in reasonable reliance upon Ross F. Charno's and Irving Charno's material and continuing representations of fact, omission of material fact and active concealment of material fact.

94. In furtherance of Ross F. Charno's unlawful scheme and within days of each

loan Melvin Gale made to RFC Securities, Ross F. Charno sent a letter to Melvin Gale confirming the loan amounts. Each letter contained continuing misrepresentation of material fact, omission of material fact and active concealment of material fact, all as part of the ongoing fraud being perpetrated on Melvin Gale and in furtherance of Ross F. Charno's unlawful scheme. These letters, sent between December 14, 2005 and January 4, 2007, hereinafter referred to as the "Gale Loan Confirmations," are attached hereto as **Composite Exhibit "G."**

95. Along with the Gale Loan Confirmations and in furtherance of Ross F. Charno's unlawful scheme, the Charnos executed several personal guarantees related to the various loans Melvin Gale made to RFC Securities. The personal guarantees, dated December 14, 2005, March 27, 2006, November 2, 2006, and December 21, 2006 were executed by Ross F. Charno, as President, RFC Securities LLC, and individually by Ross F. Charno, Irving Charno, Amanda Charno and Miriam Charno. See **Composite Exhibit "G."**

96. In each personal guarantee, the Charnos guaranteed a 12% annual return to be paid monthly. The interest rate was increased to 13% by the November 2006 personal guarantee. See **Composite Exhibit "G."**

97. In each personal guarantee, the Charnos represented that "this loan shall remain in effect until such time that you, or your authorized representative, request the return of the [amount], provided you have given RFC Securities thirty (30 days) notice of such request." See **Composite Exhibit "G."**

98. On or around December 24, 2006, in furtherance of Ross F. Charno's unlawful scheme, Ross F. Charno and his wife, Amanda Charno, sent to Melvin Gale a letter representing in part that Amando Charno has "no claims to any of the money ever in RFC Securities" and that "any assets that are in RFC Securities LLC upon dissolution <u>will go solely to Mel Gale before any other monies are taken</u>." **See Exhibit "H."** (emphasis added).

99. Unbeknownst to Melvin Gale, at the time Ross F. Charno made this representation and the other representations in the Gale Loan Confirmations, Ross F. Charno had already or was in the process of wrongfully converting, unlawfully using, depleting or diverting the funds of Melvin Gale. Upon information and belief obtained after the fact, Ross F. Charno was all along using the principal of each loan made by Melvin Gale for the forbidden purpose of day-trading, other direct investment activities or for diversion to his own personal use.

100. On January 1, 2007, as part of Ross F. Charno's unlawful scheme and continuing fraud, RFC Securities executed a Promissory Note in the principal amount of $1,500,000.00, bearing interest at 13% per annum (the "Note"). A true and correct copy of the Note is attached hereto as **Exhibit "I."**

101. The Note required the Makers, defined to include RFC Securities and the personal guarantors, Irving Charno, Miriam Charno, Ross Charno and Amanda Charno, all Defendants in this case, to pay to Payee, Melvin H. Gale & Leona Gale Trust, (the "Trust") the principal and any interest due, in full, upon thirty days written notice to the Makers.

102. Melvin Gale is a Trustee of the Trust.

103. The Note required Defendants to pay monthly interest payments in the amount of sixteen thousand, two hundred, fifty dollars ($16,250.00) on the first of every month, commencing January 1, 2007, to the Trust in Boca Raton, Florida.

104. Under the terms of the Note, in the event principal and/or interest remains unpaid for a period of thirty (30) days, the entire remaining unpaid balance and all accrued interest becomes immediately due and payable at the option of the Trust.

105. Under the terms of the Note, the Note becomes immediately due and payable at the option of the Trust upon the happening of any default or certain events, including the death of any guarantor of the Note, which, as explained above, includes Irving Charno.

106. On January 2, 2007, as part of Ross F. Charno's unlawful scheme and continuing fraud, RFC Securities, Ross F. Charno, Amanda Charno, Irving Charno, and Miriam Charno each executed an additional "corporate and personal guarantee for the $1,500,000.00 Note." The Additional Note Guarantee is attached hereto as **Exhibit "J."**

107. As part of Ross F. Charno's unlawful scheme and continuing fraud, RFC Securities made two interest payments in 2007 to Melvin Gale for the Months of January and February, as confirmed by the cover letters dated January 15, 2007 and April 15. 2007. The 2007 Gale Interest Payment Letters are attached hereto as **Composite Exhibit "K."**

108. Melvin Gale would not have loaned any of his money to RFC Securities if any Defendant revealed to him that Ross F. Charno or any other Defendant intended to or was in fact using the money for direct trading activities, or that the money was being otherwise unlawfully used, converted, depleted or diverted for or to any use other than remaining in the Goldman Sachs escrow account.

109. Before April 2007, Melvin Gale never received any indication that the money he loaned to RFC Securities was being used for trading purposes or for any purpose other than sitting in the Goldman Sachs escrow account. To date he has never received any investment or accounting statements related to trading activities from any Defendant, other than the Bocaire notebook show to him before he made the first loan.

110. Had Melvin Gale been advised that any of the money he loaned to RFC Securities was being used for trade purposes or for any purpose other than remaining in the Goldman Sachs escrow account, he would have objected, demanded an immediate return of his money and made no further loans.

111. Under no set of circumstances was the money Melvin Gale loaned to RFC Securities to be used for trading purposes.